The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and its Honorable Court. Thank you. Good morning. Everybody can be seated. Welcome to the 4th Circuit. We're going to hear argument in four cases today, and the first one is Benton v. Layton. Whenever you're ready, Mr. Ezor. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. I'm Zach Ezor. I'm just going to adjust the mic here for a second. And I'm here on behalf of Latoya Benton, who's the mother of Xavier Hill, the deceased in this case. Ms. Benton is actually here with us in the courtroom today with some of her supporters, and we all really appreciate the Court's time and attentiveness. Unfortunately, this is the sort of case that this Court sees too often. A young person is killed in an encounter with police, and the family is seeking some measure of accountability. The parties in the District Court agree on all of the standards to be applied here, both for the Fourth Amendment, qualified immunities, two-pronged tests, etc. We just disagree on the facts, which is interesting given that there is a video of this incident which depicts it fairly clearly. More specifically, we disagree on, as the District Court said, whether Xavier ever held a gun or pointed it at the officers before he was shot, and then nevertheless whether their perception that he posed a deadly threat to them was otherwise reasonable. How can you distinguish this case from Slattery and Anderson, in which we held that an officer does not need to wait until a gun is pointed at them in order to use appropriate deadly force? So, in a couple ways. The first is that the furtive movement cases basically hold that if the officers have probable cause to believe that there's a deadly threat, then you're right, Your Honor, they don't have to wait. I think in those cases, which are distinguishable, the probable cause derived from really two things. Yes, a furtive movement, but also the context within which that movement happened. Do you, at first, do you agree there was furtive movement here? That there was a movement toward the console of the vehicle? You can see clearly in the video, Your Honor, that he leans towards the center console momentarily. This all happens very quickly. Okay, so you do agree with that, that there is movement toward the center console? We can't dispute that. Even though you say it's very quickly? Yes. And do you also agree that both hands were not out the window as commanded? I know one was, the left hand. Yes, Your Honor. Okay. So, again, as depicted in the video, the left hand did come out. You know, I've watched that video probably a hundred times, and what I see is someone who is turning somewhat awkwardly and trying to put a hand out the window as he's insisting that his door doesn't open, and he's trying to open the door from the interior. So, yes, both hands don't come out, but again, this all happens, you know, 16 commands. And I think I got you sidetracked. You were saying that in those cases there was furtive movement and then, and I stopped you at the furtive movement. So, if you want to continue. Sure. So, it's actually the and then and then furtive movement. And the and then, I would say, in both of those cases, gave probable cause to believe that the individual was armed and dangerous. So, in Slattery, I think it was, let's see, there was a drug sting in an area where there had been violence. And, in fact, the officers were there investigating violence, including gun violence. And it was undisputed in that case, unlike in this case, that Slattery actually turned menacingly towards the officer and held a sort of gun-shaped object before the officer fired. Then, in Anderson, the officer was acting on a tip from an observer that Anderson had a gun under his sweater. When Anderson disobeyed the officer and moved for that exact position. Now, here, both officers filed declarations, I think, saying that they believed they saw a gun. The video doesn't necessarily depict that. What are we to do with that? Well, I'm glad you asked. You know, summary judgment in cases like this, as this court wrote extensively about in NIBS, is challenging. Because the only other eyewitness to this event, aside from the officers and the video, is dead. And so, what we're supposed to do is avoid simply accepting those officers' testimonials. And instead, consider the entire universe of possibly contradictory facts to determine whether it was reasonable for them to use excessive force. In accordance with normal summary judgment standards, correct? You're right, Judge Quattlebaum. And I would say also that you can look at the video itself as evidence of those material facts. Again, having watched the video repeatedly, that important moment where the officers both say they saw a gun, you cannot see a weapon. And there's a lot else that you can see in the video. Their headlights clearly illuminate the scene. You can see his hands, as you said, Judge Thackerett, at one point reaching out the window. You can see the silhouette of his body. One hand reaching out the window. You're right. Not both hands. You're right. You can see him turning towards the center console again, although briefly. And yet, you don't see a weapon. So, the district court actually concluded that whether or not he held a weapon or pointed it at the officers was in dispute. That's in the district court's opinion. And I think that, although the district court didn't elaborate as to why they found that, they found it on the basis of the video itself and the supporting evidence of the autopsy report. Which could be construed in a number of ways, but which says that Mr. Hill was shot in the left side of his face, the back of his neck, and his left hand. I believe you can construe that to be inconsistent with the officer's testimony, that turning towards his right to point a gun, allegedly, at Officer Layton, with his left hand in the vehicle, he was somehow shot. And those two pieces of evidence, the video and the autopsy report, at least give rise to a dispute of material fact over whether he was holding a gun. Counsel, I want to make sure I understand what you're saying there. So, is the video, is your position that the video creates a material fact based on the fact that the video doesn't show him holding the gun? In conjunction with the autopsy report. But let's just talk about the video. You're just saying it doesn't tell us one way or the other whether he was holding the gun. We have to go further than that, Your Honor, and say it affirmatively shows that he was not holding a gun. How can you, maybe, I'm trying to wrestle with that a little bit. Because if the distance and the nature of the video makes it where if he was holding a gun, it's just not visible. It might make it, I mean, if the point was the gun had been moved to a place that was visible, you know, what the camera was picking up, I think that makes sense. If, on the other hand, he had the gun in a place that was not within the lens or the vantage point of the camera, it seems like the video is neutral on the point. Right, I understand you completely. You know, this is not a case where, say, an officer at the critical moment moves in front of the lens and fully obstructs the incident. I mean, you have a full-on vantage point of Xavier during that moment, and you don't see a weapon. So I would say it's not simply neutral, it's actually affirmative evidence that he wasn't holding it or pointing it. Can I switch gears a little bit to the autopsy report and ask you about that? From an evidentiary standpoint, has anything been, you said, I would argue it says that, and I appreciate your arguments. This is not intended to be disrespectful. But is there any expert testimony that has been submitted on the autopsy report and its relationship to the deceased position at the time he was shot? Not really. There was an expert report below pertaining to the use of force in these sorts of situations and its reasonableness. But with the autopsy itself, the argument from the time of the summary judgment hearing has simply been common sense. So we'd look at it, I mean, because under summary judgment law, there has to be admissible evidence that creates a genuine dispute of material fact. I'm getting it wrong up here. And that doesn't mean you need an expert for every fact. So I'm not suggesting absolutely you do. But you have hearsay issues, perhaps, maybe a government document makes an exception to that. And we'd have to conclude that that autopsy evidence creates a genuine issue of material fact. In conjunction with the video. Yeah. Because, I mean, you're right, it's an unusual situation, use that word delicately, when you don't have the other person at the scene because they're deceased. And we recognize that in the Stanton case in particular. That said, I think our law stands for the proposition that that doesn't mean we discount the officers. What we do, if their testimony is, that's evidence. And there has to be some evidentiary basis to question it. And we don't just quickly accept it. But we don't ignore it either. Exactly right. And the way that we contest the officer's testimony, again, is through the video and the autopsy report. I completely agree about the standard. Is the autopsy report consistent with the deceased being shot once he turned to the right towards the console? It could be. But we have to view that evidence in the light most favorable to Ms. Benton. And so I would say it's equally consistent with him having his left arm down in the vehicle. I'm sorry, let me repeat. It's equally consistent with him trying to put an arm out of the vehicle, not pointing a weapon, or turning to avoid gunfire. And not dispositive of, I was holding a gun and firing it. So, moving away from the gun itself and back to Judge Thacker's question. Let me ask you this. How do you, I'd like to hear your position, the government is going to likely say that the presence of a gun is not material because it's what the officers reasonably perceived at the moment. I'm curious to hear your response. Thanks, Judge Benjamin. So, this goes to Judge Thacker's initial question about the furtive movement cases. Besides the context being really important, and us not having that context that the officers could appreciate this individual would have been armed at all, I would go further to say that the officers' commands, of which there were, again, 16, a barrage, confusing in 30 seconds, made the reasonableness of their actions, made their actions unreasonable. What part of the commands were confusing? Okay. So, first, it's just the sheer volume. You've got two officers who are yelling at you with guns pointed. They begin by saying, get out of the car now, get out of the car now. They switch to, put your hands out the car. And they switch to that because he said he couldn't open the car door. So, they said, put your hands out. These things are kind of happening simultaneously. He says, my door doesn't open. Then they switch to, put your hands out the car, put your hands out the window. And you can see, as you said, at one point he puts one hand up, right, the other hand on the door. Did he ever follow any of the commands? He followed the command to put your hands up and attempted to follow the command to get out of the car now. Will you finish with your answer to Judge Benjamin's question? Yes. Okay. No, no, I'm sorry. I was not. Okay. Go ahead. So, the reason that the flurry of commands is important is because, as this court has said in Jones, disobedience of a command does not give officers carte blanche to use lethal force. The commands have to be clear. That's said in Slattery and Anderson. And even then, the context has to permit the officer to reasonably infer that disobedience creates a threat. And I would just say, again, viewing the video in the light most favorable to Ms. Benton, what you have here is a young man who is not holding a weapon, who is trying his best over the course of just 30 seconds to respond to 16 commands, and who at one point leans towards the center console maybe to try to unlock the door. I don't know. And that that doesn't give rise to a reasonable inference of a deadly threat. Counsel, we have law that talks about the inquiry in terms of whether there's a reasonable basis to believe there's an imminent threat. Is that the time of the deadly force? It's not as clear to me whether events preceding the time shots are fired can inform the reasonableness of the officer's belief. I think it probably can inform their belief as to what's reasonable. If events happened before the immediate time the shots were fired, do you agree that what happened before, and particularly the chase, the stop, and the move, may not themselves be the basis of the imminent threat, but can inform the officer's belief as to whether there's an imminent threat? Yes, I see I'm eating into my time. So if I may answer. Yeah, please go ahead. Okay. So yes, the answer has to absolutely be yes. The case law is somewhat confusing in that it says the reasonableness is judged at the moment the shots were fired. But if you even just take a look at Graham fundamentally, the Graham factors imply that the context and the totality of the circumstances have to inform the reasonableness. And I would say that that includes not only the chase here, but also the entire encounter with the varying demands, Xavier's attempts to follow them, et cetera. Thank you. I'll reserve the rest of my time. Thank you. All right. Thank you. We'll hear from Mr. Eberstadt. Thank you, Your Honors, and may it please the Court. Rick Eberstadt for Troopers Bone and Layton, and with me at council table is Deputy Solicitor General Brendan Chestnut. This Court should affirm the district court's grant of summary judgment for two independent reasons, either of which is sufficient to affirm. First, because the troopers reasonably believed that Hill posed an immediate threat at the moment that they opened fire, and that's because after a dangerous car chase, the troopers repeatedly ordered Hill to present his hands, but Hill seemingly ignored those orders and instead reached into his car before turning towards them with what they at least perceived to be a handgun. The troopers' use of deadly force was constitutional under those circumstances. And second, because even if those actions had violated the Fourth Amendment, it certainly was not clearly established at the time that they did so. My friend on the other side cannot point to any case that would clearly establish the unlawfulness of the troopers' actions that night. And what do you think is the best case for your position? I think the two cases that are most on point here are Anderson and Slattery, and I also think it's the case that none of the cases to which my friend on the other side points would clearly establish the contrary. So as to the first point under the Fourth Amendment, this Court has explained that when an officer directs a suspect to show his hands, that the suspect's continued movement means that the officer can reasonably expect the worst at the split second that he acts. What about opposing counsel's argument that the commands were confusing and came quickly, some 16 commands in 30 seconds, and that he was trying to obey the commands? So the troopers say that at first, and the video shows that the moment they got out of the car, and I want to point out as soon as they got out of the car, Hill was still trying to escape. You can actually see in the video that the car moves as they're walking over. They spoke over each other briefly, but then Trooper Layton took control, and in the moments that led right up to the shooting, first Trooper Layton told Hill to show his hands, raise his hands, and he did so. So a reasonable officer on the scene would believe that he could understand their orders, and then Trooper Layton asked him to put his hands out of the door, and we know that he understood, or at least a reasonable officer on the scene would have believed that he understood that order, because he did actually stick one hand out of the door. Didn't they first tell him to get out, and he said he couldn't because the door, his door didn't open? That's right, Your Honor, which all the more shows that a reasonable officer would have believed that he heard and understood those orders, and so when they. And so then since he couldn't, he said he couldn't open his door, then they told him to show his hands. That's exactly. And he showed one hand. Well, at first he showed his hands. He raised them up to his head, and then they said put your hands out of the door, and he put one hand out of the door. So when the officers would have seen that, they would have understood that he understood the orders, but the fact that he was still reaching into the car with his other hand would have given them rise to believe that this was a dangerous situation. Then when they repeatedly said stop reaching, stop reaching, he actually withdrew that hand and reached with both hands towards the center console. Counsel, at one point, if I remember, I've watched this a lot too, I'm sure everyone here has. Don't they say don't move? They say stop moving and then stop reaching, stop reaching, and that's all after he begins reaching for the center console. Yeah, and I can understand stop move, moving towards the console is inconsistent with that, but it's also inconsistent with get your hands out the window. To me, I thought that was the best argument that one would make for inconsistent commands. Pretty consistent saying both hands out, and then almost as he's reaching for the door handle, says don't move. So, Your Honor, I don't think so for a couple of reasons. The first is that when they first order him to put your hands out the door, he puts one hand out and doesn't put the other. So then what he's reaching for, and my friend on the other side concedes, he's reaching for the center console, so that's the opposite direction from the door. And the order to stop moving comes after he begins reaching for the center console. Stop moving, stop reaching, stop reaching, stop reaching, put your hands out the door. These are orders that, in any sense, he did not, to a reasonable officer, obey. Can I get a little bit to the district court's order? The district court mentions that something to the effect of at least the officers perceived him to be holding a gun or pointing the gun. Two thoughts. Is that, is evidence on holding the gun necessary for the qualified immunity, number one? And number two, is the district court's framing that as the officer's perception, the right analysis? It seems to me that almost suggests it's looking at their subjective viewpoint rather than what a reasonable officer would have perceived. So as to the first point, Your Honor, it is not necessary for this court to get into the question of whether, in fact, he was holding a gun, or even the perception, though I'll get to the perception in just a moment, because I think that that adds to our side here. But in Anderson and Slattery, the fact that the suspect didn't have a gun, and in Anderson in particular, the fact that the suspect was not, had not even reached the object, was reaching for the object, shows that the, that whether he was in fact holding a gun, in fact pointing it at the officer, is not necessary under a Fourth Amendment analysis to determine that the officers reasonably perceived a deadly threat. The same is true in Slattery as well. Slattery had an object that the officers couldn't see, or the officer in question couldn't see, couldn't tell whether it was a gun or not, and then the person turned towards them. In both cases, the, this court has been clear that the Fourth Amendment does not require the officer to actually see a gun and see a gun being pointed at an officer before a deadly force is justified. As to the second question, I think that the officers, my friend on the other side, tries to dispute whether Hill in fact had a gun in his hand, in fact was pointing at a trooper latent, but I don't think that this court, we disagree, but I don't think this court has to get into that question, because it is kind of in addition to Anderson and Slattery. Anderson and Slattery, that was not required. Here the officers perceived that he was, and we both, we know that they both believed it, because in the video, both officers simultaneously say, gun, gun, as soon as he turns towards them. Assuming that's true, that's, and we, a gun was found, so I understand the record, but my point is simply, their perceptions themselves aren't the issue. Our vantage point is what a reasonable officer would have perceived, correct? It's right, Your Honor, that the question is whether a reasonable officer would have perceived a gun. I think that it's noteworthy that my friend on the other side, and my friend on the other side was responding to a question on this earlier, and in his briefing, doesn't address that exact question, the question of, as soon as they turned, we know that both officers at least believed that they saw a gun, whether that was reasonable. Because I don't think that it's, I think it's difficult for a court to say that that was not reasonable, given that they both saw it at the same time as he turned. Can I ask you a kind of unrelated question? You said that the officers were reasonable, then you said alternatively, there's no clearly established law to the contrary. Let's assume, hypothetically, we agree with you on the clearly established second prong of qualified immunity. And what does that do to the state law claims? The state law claims in that case should still be dismissed. Our friend on the other side. How, why is that, why would they be dismissed if we say there's no clearly established law? I mean, does that, don't you, doesn't the district court's decision depend, that the state courts are dismissed depend upon a reasonableness finding with respect to the constitutional claim? Your Honor, I believe that my friend on the other side has conceded that we've both agreed that the state law claims rise or fall with the federal claims on whichever grounds they're reached. I'm just trying to see how that makes sense. If you say there's no clearly established law, is that because there is, I mean, I understand the argument that if there's a finding of reasonableness, and reasonableness is an element in the claims, just matching the elements up, I'm trying, maybe you all agree on it, and I don't, we don't need to worry about it. But to me, just logically, clearly established doesn't necessarily translate to the elements of assault and battery and gross negligence. Your Honor, I understand what you're saying, but my understanding is that my friend on the other side has agreed that they rise or fall with the claims. I'll ask him later, but aside from his agreement, do you have any response to my question, just from a tracking the elements standpoint? Yes, Your Honor, I think that if it is not clearly established that the officers behaved unreasonably that night, that they could not have perceived a deadly threat, that the state law claims would still fail. That the state law claims would still fail. That's the conclusion. I kind of asked for why. Oh, that the, because if the, if it is not clearly established that the officers had done so, then my belief is that they would still fail. You're still just giving me the conclusion. I mean, under state law, lots of times reasonableness is the standard. And there's obviously a difference in reasonableness and whether something has been clearly established. Or else we wouldn't have two prongs in the qualified immunity analysis. So it's not like clearly established equals reasonableness. Your Honor, I understand what you're saying, and I think that my first answer is that, my understanding is that both sides have agreed that it rises or falls with the federal claims on either grounds. But if both sides are wrong in that agreement, we can't just be wrong because both sides agree. So I think Judge Quadalbaum is looking for the reasoning behind that agreement. And perhaps you don't have that today. Your Honor, as I stand today, I don't. But I'm happy to submit further briefing on that question if the court so asks. Okay. Well, we'll see if we need that. Do you have any other questions? I'm sorry. I have a question. So do you concede that whether or not he actually was holding a firearm is in dispute? I mean, that's what the district court found, and the video does not necessarily show that he was holding a firearm. So, Your Honor, I understand that my friend on the other side tries to dispute that fact. We disagree that a reasonable jury would find that. He does dispute that fact. Yes. And so I'm just asking you if, so you don't concede that, you think that the video shows that he was holding a firearm? No, Your Honor, that's not what I'm arguing. Okay. You're just basing it on the officer's declaration. Not only on that, Your Honor. I think that a reasonable jury would, looking at the entire record, would see that Hill had reached for some sort of object, that he had turned towards the officers, that both officers had simultaneously said, gun, gun. You can hear the fear in their voice when they do so. And then after Hill falls out of view, they are both approaching the car with caution. They then separate Hill very carefully from the gun on the passenger seat that is sitting inches from his hands, that the gun was jammed. And I don't think that any reasonable jury would look at that whole set of facts and say that, no, he was not, in fact, holding a gun at the time. So, the issue of the autopsy report, let me just say it, let me first do a hypothetical, then follow up to the actual. If the autopsy report called into question the officer's testimony that Mr. Hill was pointing a gun at him, assume you had evidence in the record that calls into question that testimony. Does, from a hypothetical standpoint, wouldn't that be something in the record that might affect the officer's credibility and would potentially create a question of fact that is material? Your Honor, from a hypothetical standpoint, if the autopsy report directly contradicted the officer's testimony, that could create a question of material fact, but that's not the case here. So, to speak about the autopsy report briefly, the autopsy report shows that Hill was shot in the back left side of the neck, in the left cheek, and in the left hand. And the reason that that doesn't contradict the officer's testimony, nor does it contradict the video, is that Trooper Bone was standing to the back left side of Hill when he shot, and as the officers testify, he raised a handgun towards Trooper Layton directly ahead of him. Trooper Bone would have been shooting directly from the left side. It would have been odd if he'd hit his right hand, because the right hand would have been shielded by the gun. His left hand would have been the one exposed. But this Court doesn't even need to reach the question of whether, in fact, Hill raised a gun at them, because at the same time, as mentioned before, Anderson and Slattery both show that under the Fourth Amendment, their actions were justified whether he, in fact, raised a gun or not. Why is this case not like Cooper or Ellman or Hensley? So, I can go through each one, Your Honor, if you like. So, when it comes to Cooper, in Cooper, the officers showed up at Cooper's house, and they entered his yard without announcing themselves. And then he even called out, he was there, and they didn't respond. So, he came out to check and make sure his own property was safe. The officers opened fire. So, in that case, it was important that Cooper had not made any sudden moves, he hadn't ignored any commands from the officers, and he wasn't even aware of their presence. That's not the case here. Hill was certainly aware of the officers' presence. He would have been perceived by a reasonable officer at the scene to have disobeyed their orders. But the appellant's argument is that these commands are unclear. And in the beginning, one of the officers is saying, get out of the car. One of the officers is saying, raise your hand. How is that different than those cases that I saw? So, because, first of all, when it comes to Cooper, there were no commands at all. In this case, there were, a while before the actual shooting, they were cross-talking, but then, in the moments before the shooting, Trooper Layton seized control, gave him clear orders that we know that he understood, or at least a reasonable officer on the scene would have understood him to understand, and that he was disobeying them. That's very much unlike Cooper. When it comes to Ailman, in that case, the suspect had called police in Spanish to say that he was turning himself in, and he had a gun. The officers showed up, and nobody spoke Spanish. So when they ordered him to put the gun down in English, and he didn't do so, this court held that it wouldn't have been reasonable for the officers to think that he was disobeying orders, and also he didn't make any sudden moves shortly before the shooting. And I think that, Judge Benjamin, you asked about Hensley as well. Is that right? Actually, Franklin is a recent decision. I'm curious where there's conflicting commands. Certainly. So when it comes to Franklin, the suspect in that case was actually actively obeying the officer when he was shot. So in that case, the officers ordered Franklin to put his gun on the ground. The gun was in his jacket. So he reached in and grabbed it in a non-firing position and pulled it out, which was necessary in order to follow the order that they were giving him. And then they shot him. He even said at the time, you know, you told me to. That is not like this case in which the concern was raised based on Hills not following the orders in the first place. And when it comes to the Fourth Amendment, based on those two cases alone, Anderson and Slattery, on the Fourth Amendment grounds, even before we get to the question of whether he had a gun and even before we get to the question of whether the troopers perceived him to have a gun, this court's precedent shows that the officers were reasonable in their decision that night that they were facing a deadly threat and to use deadly force. And if this court has no further questions, the rest of the briefs. Thank you. Thank you for your argument, Mr. Ezer. Yes, thank you, Your Honors. Just a couple of quick points. First, Judge Quattlebaum, with respect to the state law claims, I just want to be absolutely clear what our argument in our brief is, especially with respect to waiver, which my friends seem to imply in their brief. We basically just say that the Fourth Amendment analysis maps on to our claims for assault and battery, etc. The clearly established prong, though, is a matter of federal law. It's an immunity enjoyed under federal law. It has nothing to do with any immunities that they might enjoy under state law, and the district court simply did not reach that at all. So following up on that, the Supreme Court has actually instructed that we, says we're certainly able to and arguably instructed us if we could do both to perhaps go to the second prong. If we do that and don't overrule the district court's determination on the first prong, we may not resolve the state law claims here, but I'm not sure that's anything but a temporary sort of situation, I guess. Does that make sense? Because he's already found there's no genuine issue of material fact on reasonableness, so unless we say there is one, this may be a theoretical difference, but I'm not sure it ends up mattering. Does that make sense, or do you understand what I'm asking? I do. I appreciate that sort of puts the court in a bind with respect to the saucier analysis, and I would just encourage the court, as you may do, to reach both prongs in this case because of the state law claims. And I think it would be odd to say that the officers were entitled to qualified immunity on the federal claim, but then to say remand for the district court to redo what I would assume to be its exact same analysis and make declarations specific to the state law claims. But I suppose that is something that the court could do. I would really encourage you to reach both prongs here. I also want to just quickly talk about qualified immunity. You know, it's our obligation to define the right at issue, and this is one of those cases where your view of the facts influences both the underlying constitutional violation and then whether that violation was clearly established because it defines the contours of the right. So if you agree with us that this was a right not to be killed while sitting in an immobilized vehicle, attempting to follow a deluge of commands while not holding a weapon or pointing it at an officer, I would say that that right was also clearly established under precedent like Cooper, Hensley, which is, you know, I would say even more on point, and the State of Jones. So, you know, for those reasons, unless your honors have any more questions, I would ask you to reverse the grant of summary judgment. All right. Thank you for your argument. We're going to come down and greet counsel and then take a brief recess before we go on to our next case.
judges: Stephanie D. Thacker, A. Marvin Quattlebaum Jr., DeAndrea Gist Benjamin